## SYNNOTT *v.* SHAUGHNESSY.

### APPEAL FROM THE SUPREME COURT OF THE TERRITORY OF IDAHO.

No. 176. Submitted January 25, 1889. — Decided April 22, 1889.

In a suit in equity to set aside a conveyance of a silver mine in Idaho, as induced by false and fraudulent concealment and misrepresentations, the court, after stating the pleadings and the facts, *holds,* that neither the law nor the equities are with the plaintiffs.

IN EQUITY. Decree dismissing the bill, from which the plaintiffs appealed. The case is stated in the opinion.

*Mr. J. G. Sutherland* and *Mr. John R. McBride* for appellants.

No appearance for appellee.

Mr. Justice Lamar delivered the opinion of the court.

On the 24th of May, 1882, John Synnott and Peter Welch commenced an action in one of the territorial courts of Idaho Territory against Michael Shaughnessy, to have annulled the sale of the Eureka Silver Mine, situated in Mineral Hill mining district, Alturas County, in that Territory, and to compel him to reconvey the same to them as vendors. In their complaint the plaintiffs alleged that on the 5th day of July, 1881, they were the owners each of an undivided one half, and in the lawful possession, of the Eureka silver-mining claim, particularly describing it by metes and bounds, which they had located in June, 1880, and upon which they had developed a small seam or vein of galena ore, worth about $1000; that this vein was all of the ore which had been discovered by them, or either of them, upon the mining claim up to that time, and that they were ignorant of the existence of any other vein or body of ore, and believed that all the value that was then attached to the mining claim arose from the developments they had made upon the claim and the ore they had discovered, and did not exceed $2500; that on or about the 3d of July, 1881, the defendant by his agents or employés, had discovered upon a part of the Eureka mining claim, remote from the places where the plaintiffs had been at work, a large and valuable vein, or body of ore, from eighteen inches to four feet in thickness, extending about seventy feet continuously along said vein, the existence of which rendered the mine worth at least $100,000, and of the existence of which these plaintiffs were wholly ignorant; that the defendant, by his agents and servants, intending to cheat and defraud these plaintiffs, fraudulently and falsely concealed and suppressed from them the knowledge of the existence of such vein or ore body, and misrepresented the facts concerning the same, and fraudulently and falsely represented to them that no other ore body or vein of ore existed in the mining claim, except such as was known to these plaintiffs; that such false and fraudulent statements were made by the defendant, his agent and employés, in order to enable him to purchase the mining claim at a price far below

its real value; that by means of such false and fraudulent concealment and misrepresentations these plaintiffs, who believed the same to be true, were made to believe that no other body or vein of ore existed in the mining claim than that which was known to them, and that the real value of the claim was not more than $2200; that immediately prior to the discovery of the ore vein or ore body by the defendant, these plaintiffs had employed one Henry Porter as an agent to find for them a purchaser of their claim at the sum of $2500, and agreed to pay him ten per cent of that sum if he should make a sale thereof at the price mentioned; that during such employment of Porter, and while he was endeavoring to obtain a purchaser for the mine, he, himself, first made the discovery of the aforesaid ore vein and ore body, which was unknown to these plaintiffs; that upon such discovery Porter concealed the same from the plaintiffs, and falsely and collusively and for a consideration paid to him by the defendant, to wit, $1000, informed the defendant of the existence of such large vein or ore body, and then and there, in violation of his employment by these plaintiffs, and in fraud of their rights, entered into the employment of the defendant, and undertook and agreed to assist him in concealing from them the knowledge of the existence of the ore body he had discovered, and in obtaining the mining claim from them at the price of $2200, which was greatly below its real value; that by reason of those false, fraudulent and collusive acts of Porter, as well as the misrepresentations and concealments of the defendant, these plaintiffs were induced to part with their property for the sum of $2200, and to execute and deliver to the defendant a quit-claim deed of the Eureka mining claim, dated on the 5th day of July, 1881, which was afterwards duly recorded; that by reason of such conveyance thus fraudulently obtained from them, and if the same be not declared fraudulent, null and void, they will sustain great pecuniary loss and damage, to wit, $100,000; that since the conveyance to the defendant of the mining claim he has been in the possession of the same, and has extracted and taken therefrom a large quantity of ore and has made large profits therefrom, to wit, over $3000; and that the plaintiffs are ready and

willing and hereby offer to repay to the defendant the sum of $2200, the purchase price of the mining claim, together with interest from July 5, 1881, upon a reconveyance of the mining property to them.

The prayer for relief was, (1) That the deed of July 5, 1881, be declared fraudulent, null and void, and set aside by the court, and the defendant be decreed to reconvey the mining claim and premises to the plaintiffs upon their paying him the purchase price thereof, together with lawful interest from the date of the purchase; (2) that the defendant be decreed to account to the plaintiffs for the net proceeds of the ore extracted by him from the mining claim since his purchase thereof, and upon such accounting be decreed to pay the same to the plaintiffs; (3) that the defendant, his agents and employés, be enjoined and restrained from interfering with the mining claim, or extracting or clearing away any of the ore therefrom; (4) that the plaintiffs be put in possession of the mining claim by the process of the court; (5) That the defendant be decreed to pay the costs of this action; and (6) for other and further relief.

The answer of the defendant denied specifically all the material allegations of the complaint, and set out in detail the circumstances attending the purchase of the mine, which, if proved, would establish his good faith in such purchase; and the absence of any fraudulent acts on the part of himself or any of his agents connected with such transactions.

The cause having been heard upon the pleadings and proofs, the court found the facts in favor of the defendant, and entered a decree in his favor. Upon appeal to the Supreme Court of the Territory, that decree was in all respects affirmed; and an appeal from the latter decree brings the case here.

The findings of fact by the trial court, and which were adopted by the Supreme Court of the Territory, are twenty in number, and elaborately set out all the facts and circumstances attending the sale of the mine. The material facts, as gathered from these findings, stated briefly, are as follows:

For some time prior to the 5th of July, 1881, the plaintiffs,

Synnott and Welch, had owned the Eureka mine, and had lived in a cabin near by. They had done considerable work in developing it, and had found a small vein of ore, from which they had extracted, through several tunnels, about $1000 worth of ore, then lying on the premises. They were desirous of selling the claim, and entered into an agreement with one Porter, to pay him a commission of ten per cent on the sale thereof, in case he realized from such sale $2500.

Under these arrangements Porter first applied to one John Gilman to purchase the claim, but no agreement was reached between them. Porter then, on the morning of July 5, 1881, tried to induce one E. A. Wall (who afterwards acted as the agent of the defendant Shaughnessy) to purchase the claim. He informed Wall that he had a verbal option of purchase at the price of $2000, and that his terms would be a commission of $500, or one fourth of the claim, if Wall should purchase it. In the same interview he stated to Wall that he thought he could show him something on the claim that would induce him to buy it. Porter then having disclosed to Wall that he had a further appointment with Gilman to resume negotiations regarding the claim, Wall declined to have any further conference, or to make any terms for the purchase, so long as negotiations with Gilman continued.

Porter then met Gilman, and they inspected the claim together. Porter showed him float ore which he had discovered at two places on the claim, one of which was on and about the path which Synnott and Welch had usually travelled from their cabin to their work on the claim, and the other at a point about fifty yards from that path. After this inspection Gilman went immediately to Synnott and Welch, and had further negotiations with them, but they failed to agree on any terms. Synnott and Welch then informed Porter that they were willing to sell the claim for $2000, but that in that case could not allow him any commission.

On the evening of that day Porter again went to Wall, and resumed negotiations. They went together over the Eureka claim, and Porter showed Wall the float ore he had found, and insisted on having one fourth of the claim for his option

and for showing the float ore. Wall informed him that if he bought the claim it would be for the defendant Shaughnessy, who might prefer to be the sole owner, and proposed that if Porter would allow him ten days to decide he would either allow him one fourth of the claim or pay him $1000, to which Porter agreed, and at the end of that period, and after the purchase, the $1000 was paid to Porter accordingly. After their examination of the claim Wall went with Porter to the cabin of Synnott and Welch and informed them that he would buy the claim for $2000, to which they assented. Wall then told them to come down to his office at Bullion and make out their deed, and they agreed to do so. After Wall and Porter had left, Gilman returned and resumed negotiations with Synnott and Welch, finally offering them $1800 and one tenth of the proceeds of the claim, or $2200 in money for the whole. He also informed them of the fact that Porter had discovered float ore on the place. After Gilman had gone away, Porter returned to the cabin of Synnott and Welch, and the three went together to Wall's office. On the way they informed Porter of the offer made by Gilman, and intimated that they would expect the same from Wall, because they were poor, and could not afford to lose the $200, or pay any commission. On their arrival at Wall's office, Porter informed Wall of Gilman's offer, whereupon Wall told them that he would pay $2200 for the claim, adding with some asperity, that Gilman should not have it at any price. The deed from Synnott and Welch to Shaughnessy for $2200 was then drawn and executed and attested, and was acknowledged the following day.

The day after the sale Porter did some work on the claim at one of the points where he had found float ore, and on the following day Wall, as agent of the defendant, put miners at work at one of the places where float ore had been observed, and in the course of a few days, by an open cut 20 by 25 feet, discovered a body of ore in place, which, when taken out, weighed 23 tons, and netted the defendant about $800.

The ore exposed by Synnott and Welch was taken out and sold by the defendant, netting him about $90.

The defendant afterwards expended about $23,000 in devel-

oping the claim, and discovered a large and valuable lode. He has sold ore from it to the amount of about $3000. At the time this suit was brought he had opened negotiations for the sale of the claim at $150,000.

The plaintiffs in error rest their case upon two propositions, viz.: (1) The defendant, with knowledge of the existence of a large "body of ore" in this claim, by his agent, who made the purchase, wilfully misled the plaintiffs in relation thereto, and induced them to sell for a price which they would not have sold for had they been truly informed of the facts. (2) The defendant, by his agent (Wall), entered into an agreement to pay the agent of the plaintiffs (Porter) a sum of money to conceal from his principals his knowledge of the existence of a valuable body of ore, which he had informed the defendant's agent of, and then procured a conveyance from the plaintiffs of the claim in fraud of their rights.

These two propositions, in our opinion, are clearly negatived by the 12th, 14th and 15th findings of fact, which are as follows:

"12. The evidence in the case does not show or tend to show that Wall or Porter or any other person had discovered or knew of the existence of any vein or lode of ore in place on the Eureka mining claim, other than such as had been found by and was known to Synnott and Welch, in their excavations, at any time prior to the sale and execution of the deed."

"14. No false or fraudulent representations concerning the Eureka mining claim were ever made to said vendors or any one else by the defendant, or by any agent or employé of his.

"15. No concealment of any material fact concerning said mining claim was ever made by the defendant or by any agent or employé of his. Neither the defendant nor any agent of his had ever discovered or knew of the existence of any vein or lode on said claim (except such as Synnott and Welch had exposed by their tunnels) prior to the sale, nor until some days had elapsed after the sale."

In the assignment of errors, however, it is insisted that these findings are not responsive to the allegations of the complaint. It is said that the trial court did not make any

findings on the following material issues: (1) It did not find as to the value of the ore body discovered in the Eureka mining claim by Porter, and by him shown to Wall at the time the purchase was made by the latter for the defendant; (2) it did not find as to the knowledge of the existence and extent of such ore body by Wall, at the date last mentioned; (3) it failed to find whether Porter discovered any ore body, as alleged, and, if so, when, and what was its value and extent; what concealments were practised by him upon the plaintiffs, if any; what knowledge defendant or his agent had of these concealments; whether plaintiffs were offered or received the value of the claim at the time of the sale thereof; what the defendant paid Porter the $1000 for; what the contract was between Porter and Wall; and what were Porter's relations to the vendors at the time of the sale.

We do not think there is much force in this contention. It will be observed that the basis of this assignment of error is the assumption that Porter, as the agent of the plaintiffs, prior to the day the mine was sold, had discovered a valuable body of ore, the knowledge of which he concealed from the plaintiffs, and imparted to the defendant.

This assumption, as shown by the findings, to which we are restricted, is entirely without foundation. Neither Porter nor the defendant or his agent, Wall, ever discovered any vein or lode of ore on the claim at any time prior to the sale thereof by the plaintiffs. The counsel for appellants contend that the court, in finding that Porter or Wall discovered no "vein" or "lode," did not find that they discovered no "ore body." We deem it sufficient to say that the context of the complaint shows that those terms were used synonymously by the pleader, in the common parlance of miners, and not with reference to any technical distinction. The only indications of any such ore body or vein that had been found were simply a few small pieces of ore known as "float" ore, which did not of necessity indicate the existence of any large ore body. Further, the fact that Porter had found "float" ore on the claim was made known to the plaintiffs before they made the deed for the claim. Such purely surface indications, open to all ordinary

observers, and situated on or near the path along which the plaintiffs travelled in going to and from their work, must have been known to them, and are not such as to be made the subject of concealment and misrepresentation. The fact, however, that there was no such discovery of an actual vein or body of ore demonstrates that there could have been no such fraudulent and collusive concealment and misrepresentation, as to its limit and extent, as is charged in this complaint. It required not only a considerable excavation, but also a great outlay of money and great labor on the part of the defendant to develop the existence of a vein of ore.

This virtually disposes of both propositions advanced by the plaintiffs in support of their cont⸺ ̄ion. That the defendant paid Porter $1000, there is no q     on. But that such sum was paid him to conceal from the plaintiffs his knowledge of the existence of a large ore body on the claim could not have been true; for the findings state that he possessed no such knowledge. It is presumable that the plaintiffs, as men of ordinary intelligence, must have known that Porter was to receive from the defendant, or his agent, Wall, a commission for his work in the transactions connected with the sale of the mine; for the findings show that they did not pay him anything out of the sum received from such sale, as their agent, and informed him beforehand that while they were willing to sell the claim for $2000, in that case they could not allow him any commission. It really could make no difference to the plaintiffs what he was paid, since they received for the claim all they had asked for it, and in reality $200 more than they had, a few hours before, agreed to take, and within $50 of what they would have got if Porter had made the sale under their first agreement with him.

There are no other features of the case that call for special mention. In no aspect of it do we think either the law or the equities are with the plaintiffs.

The judgment of the Supreme Court of Idaho is, therefore,

*Affirmed.*